IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOHN ROSSITER, | : | |
| | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| CAPTAIN MICHAEL COSTELLO, | : | NO. 11-1183 |
| LIEUTENANT PHILIP RIEHL, and | : | |
| THE CITY OF PHILADELPHIA, | : | |
| | : | |
| Defendant. | : | |

**MEMORANDUM**

BUCKWALTER, S.J.                                                                                                           August 9, 2012

Defendants Captain Michael Costello, Lieutenant Philip Riehl, and the City of Philadelphia have filed the present Motion for Summary Judgment. For the following reasons, the Motion is granted.

I.      **FACTUAL AND PROCEDURAL HISTORY**

For approximately twenty years, Plaintiff John Rossiter has been employed as a detective in the Homicide Division of Defendant City of Philadelphia's Police Department. (Defs.' Mot. Summ. J., Ex. 1, Dep. of John Rossiter ("Rossiter Dep."), 5:2-7, Dec. 7, 2011.) In 2007, the Homicide Division was divided into One Squad, Two Squad, Three Squad, the Fugitive Squad, and the Special Investigations Unit ("SIU"). (Defs.' Mot. Summ. J., Ex. 3, Dep. of Michael Costello ("Costello Dep."), 19:6-13, Feb. 17, 2012.) Every two weeks, One Squad and Two Squad alternated between working a shift from 8:00 a.m. to 4:00 p.m. and a shift from 4:00 p.m. and 12:00 a.m. (Defs.' Mot. Summ. J., Ex. 4, Dep. of Philip Riehl ("Riehl Dep."), 22:1-7, Feb. 15, 2012.) Three Squad worked a consistent 12:00 a.m. to 8:00 a.m. shift. (Costello Dep. 19:8-

13.)  The Fugitive Squad worked from 6:00 a.m. to 2:00 p.m., with weekends off.  (Id.)  Finally, members of the SIU worked from either 7:00 a.m. to 3:00 a.m. or 3:00 a.m. to 11:00 p.m., with weekends off.  (Id.)

In 2007, Plaintiff was assigned to One Squad, which is responsible for investigating homicides.  (Rossiter Dep. 6:2-6.)  Defendant Costello served as a Captain in the Homicide Division from approximately 2005 to 2008.  (Costello Dep. 9:7-21.)  Within that division, Defendant Costello had the authority to approve reassignments to different units and to discipline personnel.  (Id. at 15:20-23, 16:11-15.)  Defendant Riehl is a lieutenant in the Homicide Division, and was one of Plaintiff's supervisors in One Squad.  (Riehl Dep. 9:7-12; Rossiter Dep. 6:7-11.)

In October 2007, Plaintiff contracted spinal meningitis and was unable to return to work until January 14, 2008.  (Id. at 10:19-11:6.)  Upon his return, Plaintiff's physician and the City's Employee Medical Unit cleared him for full duty.  (Defs.' Mot. Summ. J., Exs. 6 & 7.) Plaintiff, however, informed Defendant Riehl that he continued to experience limitations as a result of his illness.  (Riehl Dep. 71:9-13.)  He said that his stamina was "not great" and that his doctor told him he not would feel one hundred percent for up to six months.  (Id. at 71:20-23.)  In response, Defendant Riehl did not give Plaintiff any assignments upon his return.  (Id. at 72:12-15.)  Rather, Plaintiff worked the desk, answering phones and conducting interviews.  (Rossiter Dep. 14:14-24.)  He was also required to create two "Update Reports;" one was requested in January 2008 and the other in February 2008.  (Riehl Dep. 84:25-85:23.)

Plaintiff was removed from desk duty in March 2008, when he was placed back on "the wheel."  (Rossiter Dep. 16:4-10.)  The wheel refers to a list of detectives who are assigned

homicide investigations on a rotating basis. (Id. at 16:11-23.) Around this time, Plaintiff developed a persistent cough, and was informed by a doctor that he may have pneumonia. (Id. at 17:15-24.) He was also told to have a biopsy performed, as it was believed that he may have had a cancerous growth on his lung. (Id. at 18:9-13.) The biopsy was negative and Plaintiff was treated with antibiotics. (Id. at 18:13-15.) He continued working throughout the course of this illness. (Id. at 19:2-4.)

According to Defendant Riehl, Plaintiff requested a transfer out of One Squad on at least two occasions after his meningitis-related absence. (Riehl Dep. 75:25-76:7.) One such request was made on February 12, 2008, when Plaintiff asked to be transferred to either the Fugitive Squad or the SIU. (Defs.' Mot. Summ. J., Ex. 8.) It is not clear from the record when the second request was made, but both were denied by Defendant Costello. (See Riehl Dep. 76:10-12.) On April 1, 2008, Plaintiff was featured in a segment on KYW News Radio, in which he discussed his transfer denial. (Rossiter Dep. 21:3-24; Defs.' Mot. Summ. J., Ex. 10.) On April 4, Plaintiff received a memorandum from Sgt. Frank Hayes, reminding him that officers were required to inform Public Affairs and their Commanding Officers whenever they participated in an interview with the media. (Id.) Plaintiff did not receive any formal discipline for the interview. (Id.)

On April 5, 2008, Sgt. Hayes submitted a memorandum to Defendant Costello regarding a meeting he attended that day with Plaintiff and Defendant Riehl. (Defs.' Mot. Summ. J., Ex. 11.) According to Sgt. Hayes, Defendant Riehl attempted to discuss Plaintiff's KYW interview and transfer request, but Plaintiff stated that he would not speak without a representative or lawyer present. (Id.) Plaintiff was sent home after the meeting and placed on paid administrative leave for the remainder of the day. (Riehl Dep. 77:17-78:8, 97:14-99:19.) On April 7, he filed a

grievance with the Fraternal Order of Police, alleging that the meeting violated "numerous provisions of the collective bargaining agreement." (Pl.'s Resp. Opp'n, Ex. 22.)

On April 8, 2008, Defendant Riehl submitted a memorandum to Defendant Costello entitled "INSUBORDINATION," which addressed Plaintiff's reluctance to talk to him at the April 5 meeting. (Defs.' Mot. Summ. J., Ex. 12.) The memorandum articulated Defendant Riehl's belief that Plaintiff should be "reassigned immediately," citing his "disruptive and insubordinate behaviors." (Id.) On April 11, 2008, Defendant Costello temporarily reassigned Plaintiff to Two Squad. (Costello Dep. 99:12-16.)

On May 19, 2008, Plaintiff filed a complaint with the Philadelphia Commission on Human Relations ("PCHR"), alleging that the City of Philadelphia's Police Department discriminated against him on the basis of his age and/or disability. (Defs.' Mot. Summ. J., Ex. 13.) On May 19 or 20, 2008,[1] Plaintiff received an annual Performance Report. (Id., Ex. 14.) He received a mark of "satisfactory" for all aspects of his work except for "Dependability," for which he received an "unsatisfactory" mark. (Id.) "Dependability" measured the "[d]egree to which employee can be relied upon to work and to meet deadlines without close supervision." (Id.) Also, in the months of April and May 2008, Plaintiff was twice subjected to drug tests by his employer. (Rossiter Dep. 37:7-9.)

Defendant Costello was transferred from the Homicide Division to the Major Crimes Unit in May 2008, and was replaced by a man named Captain Clark. (Costello Dep. 9:19-25; Rossiter Dep. 35:11-15.) Captain Clark transferred Plaintiff to SIU, where he remained for

---

[1] The report itself is dated May 19, 2008, but Plaintiff and Defendant Riehl's signatures are dated May 20.

4

approximately ten months to a year.  (Id. at 35:7-24.)  Thereafter, at some unspecified time in 2009, Plaintiff was assigned to the Fugitive Squad.  (Id. at 36:8-13.)

Plaintiff filed his Complaint in this Court on February 22, 2011.  The Complaint contains two Counts: (I) discrimination, failure to provide a reasonable accommodation, hostile work environment, and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e ("Title VII") and the Americans With Disabilities Act, 42 U.S.C. § 12101 et seq., ("ADA") (Compl. ¶¶ 29-41); and (II) discrimination, failure to provide a reasonable accommodation, hostile work environment, and retaliation in violation of the Pennsylvania Human Relations Act, 43 Pa. C.S. § 951 et seq., ("PHRA") (Compl. ¶¶ 42-54.)  Defendants filed the present Motion for Summary Judgment on March 16, 2012.  Plaintiff filed his Response in Opposition on May 4, 2012, and Defendants filed a Reply Brief on May 8, 2012.

## II.     STANDARD OF REVIEW

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A factual dispute is "material" only if it might affect the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  For an issue to be "genuine," a reasonable fact-finder must be able to return a verdict in favor of the non-moving party.  Id.

On summary judgment, it is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations.  Boyle v. Cnty. of Allegheny, Pa., 139 F.3d 386, 393 (3d Cir. 1998) (citing Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc., 998 F.2d 1224, 1230 (3d Cir. 1993)).  Rather, the court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light

most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986) (citing U.S. v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Tigg Corp. v. Dow Corning Corp., 822 F.2d 358, 361 (3d Cir. 1987). If a conflict arises between the evidence presented by both sides, the court must accept as true the allegations of the non-moving party, and "all justifiable inferences are to be drawn in his favor." Anderson, 477 U.S. at 255.

Although the moving party bears the initial burden of showing an absence of a genuine issue of material fact, it need not "support its motion with affidavits or other similar materials negating the opponent's claim." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). It can meet its burden by "pointing out . . . that there is an absence of evidence to support the nonmoving party's case." Id. at 325. Once the movant has carried its initial burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to material facts." Matsushita Elec., 475 U.S. at 586. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson, 477 U.S. at 249. Summary judgment may be granted when "the evidence is merely colorable . . . or is not significantly probative." Id. at 249-50 (citations omitted).

## III. DISCUSSION

Defendants have moved for summary judgment on the entirety of Plaintiff's Complaint. The Court first addresses Plaintiff's claim made pursuant to Title VII before discussing the ADA and PHRA claims.[2]

---

[2] The ADA and PHRA provide similar relief and "'Pennsylvania courts . . . generally interpret the PHRA in accord with its federal counterparts.'" Rinehimer v. Cemcolift, Inc., 292 F.3d 375, 382 (3d Cir. 2002) (quoting Kelly v. Drexel Univ., 94 F.3d 102, 105 (3d Cir. 1996)). As such, Plaintiff's ADA and PHRA claims are analyzed concurrently.

### A. Title VII

"Title VII . . . creates a cause of action for discrimination based on an individual's 'race, color, religion, sex, or national origin.' Disability is not among the enumerated bases for a Title VII suit, and therefore a claim for disability discrimination brought under Title VII cannot survive." Diep v. Southwark Metal Mfg. Co., No. Civ.A.00-6136, 2001 WL 283146, at *2 (E.D. Pa. Mar. 19, 2001); see also 42 U.S.C. § 2000e-2(a)(1) (making it unlawful "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin").

Here, the Title VII claim is premised on allegations that Defendants discriminated against Plaintiff or treated him in an otherwise unlawful manner on the basis of his disability. (See Compl. ¶¶ 29-41.) He claims he was disabled "because he was diagnosed with [spinal] meningitis and hospitalized for three (3) weeks in October 2007, . . . treated for pneumonia in March 2008, and then underwent lung surgery in April 2008." (Id. ¶ 31.) The Complaint does not allege that Plaintiff was subjected to any unlawful discrimination because of his race, color, religion, sex, or national origin. In the absence of such allegations, he cannot sustain a cause of action pursuant to Title VII. Accordingly, Defendants' Motion for Summary Judgment on this claim is granted.

### B. ADA and PHRA

Plaintiff has brought ADA and PHRA claims for discrimination, failure to provide a reasonable accommodation, hostile work environment, and retaliation. The Court considers these claims below. Before doing so, however, the Court notes that Congress passed the ADA Amendments Act of 2008 ("ADAAA") in an effort to promote a less restrictive interpretation of

7

"disability." Pub. L. No. 110-325, § 2(b)(1)-(6), 122 Stat. 3553, 3555 (2008). The ADAAA went into effect on January 1, 2009, and is not applied retroactively. Garvin v. Progressive Cas. Ins. Co., No. Civ.A.08-3758, 2010 WL 1948593, at *4 n.4 (E.D. Pa. May 10, 2010). All of Plaintiff's claims arise from alleged incidents that occurred before 2009, and so the pre-ADAAA regulations apply to this case.

### 1. Discrimination, Failure to Accommodate, and Hostile Work Environment

The ADA prohibits an employer from discriminating "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). When analyzing discrimination claims under the ADA, courts apply the burden-shifting framework announced in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Parker v. Verizon Pa., Inc., 309 F. App'x 551, 555 (3d Cir. 2009). Under the McDonnell Douglas scheme,

> (1) plaintiff bears the burden of establishing a prima facie case of discrimination; (2) the burden of production then shifts to defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action; and (3) if defendant meets its burden of production, plaintiff must prove by a preponderance of the evidence that defendant's proffered reason was a pretext for discrimination.

Id. (citing McDonnell Douglas, 411 U.S. at 802).

In order to demonstrate a prima facie case of discrimination under the ADA, the plaintiff must show the following: "(1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination." Gaul v. Lucent Techs., Inc., 134 F.3d 576, 580 (3d Cir.

1998) (citing Shiring v. Runyon, 90 F.3d 827, 831 (3d Cir. 1996)). Failure to provide a reasonable accommodation is considered a form of ADA discrimination. See 42 U.S.C. § 12112(b)(5); Hohider v. United Parcel Serv., Inc., 574 F.3d 169, 186-87 (3d Cir. 2009).

Next, when bringing a hostile work environment claim under the ADA, the plaintiff must demonstrate that: "(1) she is a qualified individual with a disability under the ADA, (2) she was subject to unwelcome harassment, (3) the harassment was based on her disability or request for an accommodation, (4) the harassment was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment, and (5) the employer knew or should have known of the harassment and failed to take prompt, effective remedial action." Lowenstein v. Catholic Health E., 820 F. Supp. 2d 639, 646-47 (E.D. Pa. 2011) (citing Walton v. Mental Health Ass'n of Se. Pa., 168 F.3d 661, 667 (3d Cir. 1999)).

In this case, Plaintiff alleges that Defendants discriminated against him and subjected him to a hostile work environment by: (1) denying his requests to transfer out of One Squad and to change from a rotating to a steady shift; (2) assigning him additional, unnecessary work; (3) having him tested for drug use; and (4) giving him poor performance evaluations. (Compl. ¶¶ 33(a), 35(a).) He asserts that the hostile work environment was exacerbated when, after talking to the media, he was ordered to leave his shift early. (Id. ¶ 35(a).) Plaintiff further alleges that Defendants failed to provide him reasonable accommodations for his disability, such as a transfer, a steady shift, and less work. (Id. ¶ 34.) Because failure to accommodate is considered a form of discrimination, the Court does not treat it as a separate cause of action.

Defendants concede, for the purposes of their Motion, that Plaintiff is qualified for the functions of his job. (Defs.' Mem. Supp. Mot. Summ. J. ("Defs.' Mem.") 6.) They contend,

however, that Plaintiff's ADA discrimination claim must fail because he cannot show that he is disabled or experienced an adverse employment action. (Id.) As explained more fully below, the Court finds that Plaintiff has not introduced sufficient evidence to establish a disability within the meaning of the ADA. Therefore, it need not reach the question of whether Plaintiff was subjected to an adverse employment action. Furthermore, because the existence of a disability is an essential element of an ADA hostile work environment claim, the Court grants Defendants' Motion for Summary Judgment on this claim as well.

Under the ADA, a disability is defined as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). Major life activities refer to "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i). To determine whether a plaintiff is "substantially limited" in performing a major life activity, courts consider: "'(i) [t]he nature and severity of the impairment; (ii) [t]he duration or expected duration of the impairment; and (iii) [t]he permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment.'" Namako v. Acme Mkts., Inc., No. Civ.A.08-3255, 2010 WL 891144, at *4 (E.D. Pa. Mar. 11, 2010) (quoting Emory v. AstraZeneca Pharms. LP, 401 F.3d 174, 179-80 (3d Cir. 2005) (citing 29 C.F.R. § 1630.2(j)(2)).

Here, in arguing that Plaintiff was not disabled within the meaning of the ADA, Defendants note that after his recovery from spinal meningitis, Plaintiff was cleared for full duty by both his personal physician and the City's Employee Medical Unit. (Defs.' Mem. 7.) Neither the physician nor the medical unit indicated that Plaintiff had any limitations. (Id.) Next,

Defendants point to Plaintiff's own deposition testimony, where he stated that his only impairment was an inability to stay awake for twenty-four consecutive hours. (Id.) Defendants contend that, with the exception of one day that Defendant Riehl had Plaintiff work two hours of overtime, they never required him to work extended hours. (Id.) Furthermore, Defendants note that in March 2008, when he was placed back on the rotation of officers investigating homicides, Plaintiff felt fine and did not experience any physical limitations. (Id. at 8.) Finally, Defendants argue that there is no evidence that Plaintiff's bout with pneumonia and lung biopsy, which caused him to miss one day of work, prevented him from performing the essential functions of his job. (Id.)

In response, Plaintiff contends that he "is claiming a disability under the subsection (A) [of 42 U.S.C. § 12102(2)]; that he has a physical impairment of fatigue due to his long term illness of spinal meningitis, and such impairment substantially limits his ability to stay awake for more than 12 hours a day." (Pl.'s Resp. Opp'n 4.)[3] He asserts that the major life activities that were substantially limited were "standing for long periods of time and staying awake for over ten consecutive hours." (Id. at 5.) He notes that Defendant Riehl himself testified that, based on his own observations, he believed Plaintiff had not fully recovered from his illness when he returned to work in January 2008. (Id.)[4]

---

[3] In his Response, Plaintiff does not argue that he had a record of an impairment or was regarded as having an impairment.

[4] The fact that Defendant Riehl believed Plaintiff was impaired does not create a question of fact as to whether Plaintiff was regarded as disabled under 42 U.S.C. § 12102(2)(C). As previously noted, Plaintiff has not argued in his brief that he meets the "regarded as" definition of disability. Furthermore, the Third Circuit has held "that to be covered under the 'regarded as' prong of the ADA the employer must regard[] the employee to be suffering from an impairment within the meaning of the statutes, not just that the employer believed the employee to be

The Court is unpersuaded by Plaintiff's argument for several reasons. To begin with, he has not submitted any medical evidence of a disability. As Defendants note, his medical records state that he was cleared for full duty after missing work with spinal meningitis, and do not identify any limitations. Second, Plaintiff apparently relies on the ADAAA definition of major life activities. "Standing" and "staying awake for over ten hours" are not included among major life activities in the pre-ADAAA definition. Nevertheless, in ruling on Defendants' Motion for Summary Judgment, the Court is required to examine the evidence in the light most favorable to Plaintiff. In doing so, the Court finds that, based on Plaintiff's deposition testimony, he believed his fatigue impaired the major life activity of working—i.e. his ability to do his job—which was included in the pre-ADAAA definition.

After a thorough review of the record, the Court finds insufficient evidence that Plaintiff's ability to work was substantially impaired. As previously discussed, there are no medical documents stating that Plaintiff was disabled. Therefore, the only evidence concerning Plaintiff's condition is Plaintiff's own deposition transcript. Plaintiff testified that, upon returning from his illness, his only limitation was an inability to work longer than ten or twelve hours:

> Q. How did you feel when you had the spinal meningitis?
> A. When I was put back to work, I felt fine. However, I had no ability to extend my waking hours beyond ten or 12 hours. I could not stay up for 24 hours straight. It was physically impossible, which is often required at the homicide division.
> Q. What other issues affected your ability to do your job after you contracted and were recovering from spinal meningitis?

---

somehow disabled." Rinehimer v. Cemcolift, Inc., 292 F.3d 375, 381 (3d Cir. 2002) (internal quotations omitted). Neither party has argued that Defendant Riehl believed Plaintiff had an impairment within the meaning of the ADA.

> A. My ability to perform as a detective was never affected. The only thing that was affected was the fact that I could not stay up for 24 hours straight.

(Rossiter Dep. 12:3-15.) For nearly two months after his return, Plaintiff worked at the Homicide Division's desk. (Id. at 14:14-21, 16:4-6.) When he returned to performing live investigations, he was able to perform his duties without any limitation:

> Q. In March of 2008 you were placed or assigned to investigate the homicide cases. Is that correct?
> A. Yes, that's correct.
> Q. What problems did you experience when you were assigned to—what physical problems or limitations did you experience when you had to then investigate homicide cases?
> A. None.
> Q. So there were no physical limitations?
> A. No.
> Q. You felt fine doing that?
> A. Perfectly fine.
> Q. You had no issues with stamina, and you were fine performing those duties?
> A. Yes.

(Id. at 16:21-17:11.) In sum, the only impairment described by Plaintiff is an inability to work longer than ten to twelve hours. Plaintiff has not cited, and the Court has been unable to identify, any authority to support the argument that this is a substantial limitation. To the contrary, the Third Circuit has recognized that an "inability to work overtime does not constitute a substantial limitation." Bialko v. Quaker Oats Co., 434 F. App'x 139, 142 (3d Cir. 2011). Other federal district and circuit courts have come to similar conclusions regarding the impairment described by Plaintiff. See, e.g., Whitney v. Wal-Mart Stores, Inc., No. Civ.A.04-38-P-H, 2004 WL 2792297, at *8 (D. Me. Dec. 3, 2004) ("[The plaintiff's] evidence demonstrates that his only physical limitation on working is that he must not work more than 9 hours per day and must have two consecutive days of rest. Such a limitation on the ability to work does not amount to a substantial limitation."); Matheson v. Virgin Islands Cmty. Bank, Corp., 297 F. Supp. 2d 819,

828 (D.V.I. 2003) ("A person whose condition prohibits working more than forty hours per week does not suffer a limitation 'substantial enough to rise to the level of a protected disability under the ADA.'") (quoting Duff v. Lobdell-Emery Mfg. Co., 926 F. Supp. 799, 807 (N.D. Ind. 1996)); Roth v. Lutheran Gen. Hosp., 57 F.3d 1446, 1454-55 (7th Cir. 1995) (finding that "an inability to fulfill long shifts or 36 hour call duties" did not establish the existence of a disability within the meaning of the ADA). The Court therefore finds that any limitation Plaintiff experienced after returning to work in January 2008 did not rise to the level of a substantial impairment under the ADA.

Furthermore, Plaintiff's subsequent bout of pneumonia and his lung biopsy do not constitute disabilities. The Third Circuit has held that "pneumonia is a temporary condition and is not protected by the ADA." Rinehimer, 292 F.3d at 381. With respect to the biopsy, Plaintiff admitted that he felt fine after the procedure and that it did not affect his ability to do his job. (Rossiter Dep. 27:2-15.) Accordingly, the Court finds that Plaintiff has failed to establish that he was disabled within the meaning of the ADA. Defendants' Motion for Summary Judgment on Plaintiff's claims for discrimination—including the failure to accommodate claim—and hostile work environment is therefore granted.

### 2. Retaliation

"To establish a prima facie case of retaliation under the ADA, a plaintiff must show: (1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." Krouse v. Am. Sterilizer Co., 126 F.3d 494, 500 (3d Cir. 1997). The Third Circuit has held that "a person's status as a 'qualified

individual with a disability' is not relevant in assessing the person's claim for retaliation under the ADA." Id. at 498.

Here, Plaintiff alleges that he engaged in protected activity on May 19, 2008, when he filed an employment discrimination charge with the PCHR and EEOC. (Compl. ¶¶ 36(a), 49(d).) According to Plaintiff, Defendants retaliated against him by giving an unsatisfactory mark on his Performance Report. (Id. ¶¶ 36(b), 49(e).) He alleges that this was the first unsatisfactory mark he received in over thirty years with the police force. (Id. ¶¶ 36(c), 49(f).) Defendants have moved for summary judgment on this claim. They assert that the Performance Report at issue was prepared by Sgt. Hayes on May 16, 2008, that it was dated May 19, 2008, and signed by Defendant Riehl on May 27, 2008. (Defs.' Mem. 10-11.) Given this sequence of events, Defendants argue that the filing of the PCHR and EEOC complaint on May 19, 2008 could not have influenced the Performance Report. (Id. at 11.)

In his Response in Opposition, Plaintiff asserts that, in addition to the PCHR and EEOC complaints filed on May 19, 2008, he also engaged in protected activity when he filed grievances with the Fraternal Order of Police on July 12, 2007, February 21, 2008, and April 7, 2008. (Pl.'s Resp. Opp'n 17.) He further contends that Defendants retaliated against him by denying him a transfer or a steady shift, removing him from desk duty and assigning him to active homicide investigations, ordering him to produce excessive Update Reports, subjecting him to excessive drug testing, and counseling him for speaking to the media. (Id. at 18.)

None of these allegations, however, are contained in the Complaint. With respect to the ADA and PHRA retaliation claims, the filing of the May 19, 2008 complaint is the only identified protected activity. (See Compl. ¶¶ 36, 49.) The only adverse action that is specified is

15

the unsatisfactory mark Plaintiff received on his Performance Report. (Id.) Accordingly, these are the only allegations that the Court considers in assessing Plaintiff's retaliation claim. See Pankey v. Phila. Hous. Dev. Corp., No. Civ.A.09-3943, 2011 WL 1161918, at *6 n.2 (E.D. Pa. Mar. 29, 2011) ("[A] claim . . . not alleged in the complaint, cannot be raised for the first time in response to a motion for summary judgment.") (citing Jeffries v. Ameriquest Mortg. Co., 543 F. Supp. 2d 368, 385 (E.D. Pa. 2008)).

    Having reviewed the record, the Court concludes that while Plaintiff engaged in protected activity when he filed his PCHR and EEOC complaint on May 19, 2008, he has not established the existence of an adverse employment action. The Performance Report at issue had ten "Performance Factors," for which the employee received either a satisfactory or unsatisfactory mark. Plaintiff received a satisfactory mark for Quality of Work, Work Habits, Relationship With People, Initiative, Analytical Ability, and Promotional Potential. (Defs.' Mot. Summ. J., Ex. 14; Pl.'s Resp. Opp'n, Ex. 9.) He received an unsatisfactory mark for Dependability,[5] and his overall rating was satisfactory. (Id.)

    Nothing in the Performance Report could be construed as an adverse employment action. As explained by another district court within the Third Circuit, "[t]o constitute an adverse employment action, the negative performance review must tangibly alter the terms and conditions of employment. Thus, the mere allegation that a negative evaluation took the employee 'off track for promotion and formed a basis for denying him opportunities' is too conjectural to be actionable." Foster v. Ashcroft, No. Civ.A.05-1734, 2006 WL 1995305, at *2 (D.N.J. July 14,

---

    [5] Plaintiff did not receive any mark for Quantity of Work, Ability as Supervisor, or Administrative Ability. (Defs.' Mot. Summ. J., Ex. 14.)

2006) (quoting Turner v. Gonzales, 421 F.3d 688, 696 (8th Cir. 2005)); see also Cashman v. CNA Fin. Corp., No. Civ.A.08-5102, 2012 WL 113667, at *12 (E.D. Pa. Jan. 13, 2012) ("A negative performance review and being placed on a performance improvement plan, without more, is not an adverse employment action."). Here, Plaintiff has not even alleged that the Performance Report altered the conditions of his employment. He does not argue that his position was terminated, that he was subjected to a decrease in pay or benefits, was denied a promotional opportunity, or experienced any other change with respect to his employment. Indeed, Plaintiff was given the best possible mark in five out of the six factors upon which he was evaluated, including the category of Promotional Potential. In the absence of any evidence that Plaintiff experienced an adverse employment action that was causally related to his filing a complaint with PCHR and EEOC, the Court grants Defendants' Motion for Summary Judgment on Plaintiff's ADA and PHRA retaliation claims.[6]

## IV.     CONCLUSION

For all of the foregoing reasons, the Court finds that Plaintiff has not alleged that he was discriminated against on the basis of his race, color, religion, sex, or national origin. He has also failed to introduce evidence of an impairment that substantially limits a major life activity, and is therefore not disabled within the meaning of the ADA. Finally, the unsatisfactory mark Plaintiff received on his Performance Report does not constitute an adverse employment action. Defendants' Motion for Summary Judgment is therefore granted in its entirety.

---

[6] Defendants also argue that they are entitled to summary judgment on the grounds that Plaintiff failed to attach to his Complaint a right to sue letter from the EEOC. (Defs.' Mem. 13-14.) Because the Court is granting the Motion for Summary Judgment in its entirety on other grounds, it declines to consider this argument.

An appropriate Order follows.[7]

---

[7] In the proposed Order accompanying his Response in Opposition, Plaintiff asks the Court to deny Defendants' Motion or, in the alternative, to allow him to file an Amended Complaint. At this stage of the litigation, Plaintiff would be permitted to amend his pleading "only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). Plaintiff has not provided the Court with any substantive argument as to why he should be permitted to amend his Complaint, and the Court finds no good cause for doing so. Accordingly, this request is denied.